## CIRCUIT COURT OF FAIRFAX COUNTY

Charles Dell, etc.

v.

Kathleen B. French et al.

August 2, 1995

Case No. (Law) 125320

■■■■■

BY JUDGE JANE MARUM ROUSH

This matter came on to be heard on May 5, 1995, on the Defendants' demurrer. The Court requested and received supplemental briefs from counsel. The Court has now had the opportunity fully to consider the pleadings, the briefs, and the arguments of counsel. For the reasons stated below, the demurrer is sustained in part and overruled in part.

### Facts

A demurrer admits the well-pleaded facts alleged in the motion for judgment, as well as those facts that may be fairly inferred from the facts alleged. *See, e.g., Rosillo v. Winters*, 235 Va. 268, 367 S.E.2d 717 (1988); *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832 (1987).

This medical malpractice action commenced on July 22, 1993. Plaintiff is Charles Dell as guardian for the person and property of Ruth Dell. The defendants are Kathleen B. French, M.D., and her employer, Virginia Neurologic Center, Ltd. ("VNC").[1]

The Motion for Judgment alleges that Mrs. Dell was involved in an automobile accident on December 21, 1991, in which she suffered a right-

---

[1] Plaintiff nonsuited his claims against defendants, James R. Howe, M.D., and Donald C. Oxenhandler, M.D., by order entered on January 5, 1995.

sided subdural hematoma. ¶ 1.[2] She was taken by helicopter to Fairfax Hospital. ¶ 1. Dr. French, a neurosurgeon, was "on call" for Fairfax Hospital on the night Mrs. Dell arrived at the hospital. ¶ 2. In the early morning hours of December 22, 1991, Dr. French mistakenly operated "on the left side of [Mrs. Dell's] brain, not the injured right side, notwithstanding the absence of either clinical or radiological reasons for doing so." ¶ 3. The procedure was "erroneous and unnecessary" and caused injury to the left side of Mrs. Dell's brain. Mrs. Dell's original injury, the right-sided subdural hematoma, went untreated. ¶¶ 3, 5. On December 23, 1991, a colleague of Dr. French's at VNC performed a second surgery to correct the injury caused to the left side of Mrs. Dell's brain by Dr. French's surgery. The original right-sided subdural hematoma continued to go untreated. ¶ 4.

Neither Dr. French nor anyone else at VNC notified Mr. Dell or other family members of the original surgical error. ¶ 6. In fact, on December 27, 1991, Dr. French met with family members and advised them of Mrs. Dell's "medical course to date in a manner that was incomplete and misleading and was intended to cover up the fact of the initial surgical error and the injury it caused." ¶ 6.

On January 6, 1992, Dr. French attempted the first reduction of the right-sided subdural hematoma, "but the approach employed and the execution of that approach were inappropriate." ¶ 8. A "new and additional injury was caused when the drainage tube employed penetrated the patient's brain tissue." ¶ 8. The procedure employed for the January 6, 1992, surgery "was selected so as to make the procedure appear to the family relatively minor when compared to the major surgeries of December 22 and 23, 1991." ¶ 8.

Beginning December 21, 1991, and continuing until January 6, 1992, Dr. French and VNC did not advise the family: (1) of the serious surgical error that had occurred on December 22, 1991, (2) that the December 23, 1991, surgery was to correct Dr. French's error of December 22, 1991, or (3) that the original right-sided subdural hematoma went untreated although it needed surgical revision. Dr. French and VNC "conspired, combined, and agreed to maintain their silence about the error" and present a "united front" to the family that everything possible was being done for Mrs. Dell. ¶ 9.

---

[2] All paragraph numbers refer to the numbered paragraphs of the Motion for Judgment.

Mrs. Dell was "at risk to develop a condition known as communicating hydrocephalus." Dr. French discharged Mrs. Dell to Mount Vernon Hospital for rehabilitation and did not take the necessary steps to rule out communicating hydrocephalus. ¶ 10. Mrs. Dell developed communicating hydrocephalus which was treated at Mount Vernon Hospital by the installation of a lumbar-peritoneal shunt. ¶¶ 11-16.

Mr. Dell eventually transferred the care of his wife's head injury to another doctor. A different shunt was installed, and Mrs. Dell improved considerably. Nevertheless, she has residual injuries from the original unnecessary surgery, the delay in treatment of her original right-sided subdural hematoma, the inappropriate treatment of that hematoma, and inadequate management of her hydrocephalus. ¶¶ 17-20.

### Causes of Action Asserted

Based on the above-stated facts, the Plaintiff filed an eleven-count Motion for Judgment against the Defendants. Count I alleges a cause of action for medical malpractice. (Counts II and III have been previously nonsuited.) Count IV asserts a cause of action for actual fraud and deceit. Count V asserts a cause of action for constructive fraud. Count VI asserts a cause of action for breach of fiduciary duty. Count VII seeks recovery based on Defendants' alleged breach of trust and confidence. Count VIII alleges a cause of action for battery based on lack of consent. Count IX alleges a cause of action for battery, based on a lack of informed consent. Count X seeks recovery of money wrongfully had and received (i.e., the fees paid to the defendants for Mrs. Dell's care). Count XI seeks recovery based on a theory of "civil conspiracy."

In addition, in paragraphs 65 through 69 of the Motion for Judgment, the Plaintiff "specially pleads" that the ceiling or cap on recovery in a medical malpractice case provided for by Code § 8.01-581.15 does not apply to the facts of this case "because the conduct of the defendants and the matters pleaded go beyond medical malpractice." Alternatively, the Plaintiff claims that the cap is unconstitutional as applied to the facts of this case and/or is unconstitutional on its face. The plaintiff further argues that the cap applies separately to the acts of Dr. French on December 22, 1991, and to the subsequent acts and omissions of the Defendants. Finally, the Plaintiff argues that the Defendants are estopped from pleading the applicability of the cap.

■

### The Demurrer

Dr. French and VNC demurred to Counts IV (actual fraud), V (constructive fraud), VI (breach of fiduciary duty), VII (breach of trust and confidence), and XI (civil conspiracy) of the Motion for Judgment, as well as to the matters related to the medical malpractice cap "specially pleaded" by the Plaintiff.[3] The Court will consider separately the demurrer to the counts of the Motion for Judgment and to the matters specially pleaded.

### A. *Demurrer to Counts IV through VII*

Defendants demurred to Counts IV (actual fraud), V (constructive fraud), VI (breach of fiduciary duty), and VII (breach of trust and confidence) on the basis that those counts do not state causes of action separate from the medical malpractice cause of action pleaded in Count I.

The Defendants claim that Counts IV and V do not plead sufficient facts to support fraud on the part of the Defendants. According to the Defendants, both counts are based on the Defendants' failure fully to disclose to Mrs. Dell's family the facts of her condition and treatment, and "[f]ailure to disclose, as alleged, does not rise to the level necessary to sustain an action for fraud." Demurrer at ¶ 1. Defendants argue that Counts VI and VII also allege breaches resulting from a failure to disclose. As such, "they are not only duplicative of what has been asserted in Count IV (fraud and deceit) and Count V (constructive fraud), but also attempt to assert causes of action that are not recognized by Virginia law." Memorandum in Support of Demurrer at p. 1.

The Defendants contend that a breach of a duty fully to disclose relevant facts concerning a patient's care is "no more than the allegations which are already contained in the malpractice Counts of the Motion for Judgment." Memorandum in Support of Demurrer, at p. 2. *See, e.g., Dietz v. King*, 184 F. Supp. 944 (E.D. Va. 1960) (a physician "owes a duty to his patient to make reasonable disclosure of all significant facts under the circumstances of the then situation").

The Plaintiff responds that he has pleaded sufficient facts to overcome a demurrer to the fraud counts of the Motion for Judgment. Further, the Plaintiff argues that "actual fraud, as alleged in the motion for judgment,

---

[3] The Defendants' memorandum in support of their demurrer addressed Counts VIII and IX of the Motion for Judgment, but the demurrer itself did not cite those counts. Therefore, the Court will not address those counts, as the memorandum cannot rise above the pleading it supports.

is not encompassed in the statutory definition of malpractice." Plaintiff's Opposition to Demurrer, at p. 4.

In a similar case in this Court, the Court distinguished between *nondisclosure* of material facts related to a patient's care by a health care provider, which is encompassed within medical malpractice, and purposeful *misrepresentation* of material facts, which may be fraud and not encompassed within medical malpractice. *Peterson v. Fairfax Hospital Systems, Inc.*, 31 Va. Cir. 50 (1993).

*Peterson* involved an injury to an infant caused by the administration of adult-strength insulin at Fairfax Hospital. The child's parents brought suit, alleging that the hospital, its attorneys, and others conspired to cover up the error, to the extent that they fabricated a tale of a criminal interloper who administered the insulin to the child, rather than an agent of the hospital. In *Peterson*, Judge Horne ruled that *nondisclosure* of material facts, "no matter how nefarious the purpose," was encompassed within the definition of malpractice and subject to the statutory cap on damages provided by Code § 8.01-581.15:

> The Court finds that the Plaintiffs have [in Count I (breach of fiduciary duty)] failed to plead with specificity any duty other than a general duty which arises out of the relationship between the parents and the Hospital of full, honest, and fair disclosures of information. Breach of such duty violates the general standards of care relative to all health care providers. No other special duty imposed by contract is stated or may be reasonably implied from the Amended Motion for Judgment.

31 Va. Cir. at 59. Conversely, "a *misrepresentation* of material facts relative to treatment, whether to disguise the truth or for some other reason to guide the actions of the unwary, does not reasonably relate to the delivery of health care services." 31 Va. Cir. at 60 (emphasis added). *See also Scioletti et al. v. Buchanan et al.*, At Law Nos. 93-6789, 94-770, and 94-7069 (Circuit Court of the City of Williamsburg), Order dated April 28, 1995 ("misrepresentation" counts are not claims for medical malpractice); *Petter v. Acevedo*, 31 Va. Cir. 7 (1993) (fabrication of patient's medical record and false testimony are not medical malpractice).

In the *Peterson* case, Judge Horne analyzed the Virginia Supreme Court's decision in *Hagan v. Antonio*, 240 Va. 347, 397 S.E.2d 810 (1990). In that case, the Supreme Court held that "medical malpractice" may include a range of tortious conduct committed by a health care provider

based on health care or professional services rendered. In *Hagan*, the plaintiff brought suit against a doctor who allegedly sexually assaulted her by fondling her breasts during the course of a physical examination. The issue in that case was whether the acts of the doctor complained of constituted "medical malpractice" such that the plaintiff had to give a prior notice of claim under former Code § 8.01-581.2(A). The Supreme Court ruled that the statutory definition of medical "malpractice" contained in Code § 8.01-581.1[4] includes tortious, even possibly criminal acts, by a health care provider, provided that the acts are based on, arise from, or stem from the provision of medical care to a patient. *Id.* at p. 351. The *Hagan* court found that the alleged sexual assault (by fondling the plaintiff's breasts), if proved, would be medical "malpractice" as defined by Code § 8.01-581.1.[5] The Court in *Hagan* distinguished the fondling of the plaintiff's breasts, which is "an inseparable part of the health care being rendered," and a robbery or rape committed by a health care provider in the course of an examination. The Court opined that a rape or a robbery would not be medical malpractice because such actions "could never arguably be classified as an inseparable part of examination or treatment." 240 Va. at 351.

Having reviewed the allegations of the Motion for Judgment in this case in light of the guidance provided by *Hagan* and *Peterson*, the Court finds that the Plaintiff has alleged facts sufficient to withstand a demurrer to Counts IV and V (the fraud counts), but not Counts VI and VII (the breach of duty and breach of trust counts).

It is helpful to begin the analysis of Counts IV and V by revisiting familiar principles of Virginia law:

> One who advances a cause of action for actual fraud bears the burden of proving by clear and convincing evidence: (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with the intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. Con-

---

[4] Code § 8.01-581.1 defines medical malpractice as "any tort based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." Va. Code Ann. § 8.01-581.1 (1995 Cum. Supp.).

[5] Accordingly, the Supreme Court affirmed the trial court's sustaining a demurrer and dismissing a motion for judgment because the plaintiff had not given prior notice of her medical malpractice claim to the health care provider as required by former Code § 8.01-581.2(A).

structive fraud differs from actual fraud in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently although resulting in damage to the one relying on it. However, as with actual fraud, the elements of constructive fraud also must be proved by clear and convincing evidence.

*Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994) (citations omitted).

At first blush, Counts IV and V appear to be based on the Defendants' nondisclosure of material facts. In both Counts IV and V, the Plaintiff alleges that the Defendants "fail[ed] to disclose what they had a duty to disclose." Motion for Judgment, ¶¶ 34 and 37. Other paragraphs of the Motion for Judgment, however, which were incorporated in Counts IV and V, allege a purposeful misrepresentation by the defendants of material facts related to Mrs. Dell's care. For example, the Motion for Judgment alleges that:

(1) Dr. French advised the family on December 27, 1991, that Mrs. Dell had a "chronic right sided subdural hematoma which was resolving," when, in fact, the hematoma "was not resolving, on its consistency had changed secondary to the passing of time, and its shape on the CT scan [was] altered by the cerebral edema caused by the multiple insults to the patient's brain." ¶ 6.

(2) The family was advised that Mrs. Dell's medical problems were being managed appropriately and in her best interests. ¶ 7.

(3) Dr. French "deliberately mis[led] the patient's family about the etiology of the right sided subdural hematoma and its prognosis." ¶ 21.

(4) The Defendants made the misrepresentations with the intent to "maintain their silence about the [original surgical] error and to present to the patient's family a united front that [the Defendants] were doing everything possible for the patient." ¶ 9.

(5) The Dell family relied upon the misrepresentations in leaving Mrs. Dell in the Defendants' care, with the result that the surgical error and inappropriate treatment were not earlier discovered and rectified, and Mrs. Dell's injuries were exacerbated as a result. ¶¶ 34, 37.

Taking those factual allegations of the Motion for Judgment as admitted, the Court concludes that the Motion for Judgment alleges facts sufficient to withstand a demurrer to Counts IV and V. Fraud, whether actual or constructive, to the extent it is based on purposeful misrepresentations of

material fact related to the patient's care, is a separate cause of action from medical malpractice. The demurrer to Counts IV and V will be overruled.

Conversely, both Counts VI and VII allege no more than that the Defendants breached their duty "to make true and proper disclosures of relevant facts to those entrusted with making decisions for her care." Motion for Judgment, ¶¶ 40, 44. For the reasons stated above, the Court concludes that such nondisclosure of material facts related to a patient's care is a violation of the standard of care for all health care providers. On the facts alleged in the Motion for Judgment, there is no separate cause of action recognized by Virginia law for breach of fiduciary duty or breach of trust and confidence. If proven, the breaches alleged in Counts VI and Count VII amount to no more than medical malpractice, which is sufficiently pleaded in Count I of the Motion for Judgment. Therefore, the demurrer to Counts VI and VII is sustained.

## B. *Demurrer to Count XI*

The Defendants demurred to Count XI (civil conspiracy) of the Motion for Judgment. The Defendants argue that the Plaintiff has failed to allege the necessary elements of a civil conspiracy claim under Virginia law. The Defendants contend that the doctrine of intracorporate immunity precludes a finding that VNC conspired with its employee, Dr. French, while acting in the scope of her employment:

> Simply put, the doctrine of intracorporate immunity holds that because at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself. Since a corporation is merely a legal entity wholly created by law, it can act only through its agents, officers, and employees; therefore, a conspiracy between a corporation and the agents of that corporation who are acting in the scope of their employment is a legal impossibility.

Defendants' Memorandum in Support of Demurrer, at p. 4, *citing, Selman v. American Underwriters*, 697 F. Supp. 225, 238 (W.D. Va. 1988); *Griffith v. Electrolux Corp.*, 454 F. Supp. 20, 32 (E.D. Va. 1978).

In his memorandum of points and authorities, the Plaintiff does not respond to the demurrer to Count XI. For that reason and because the Court agreed that the doctrine of intracorporate immunity applies to this

case based on the facts as alleged in the Motion for Judgment, the demurrer to Count XI will be sustained.

## C. *Demurrer to Matters Specially Pleaded*

The Defendants have demurred to paragraphs 65 through 69 of the Motion for Judgment, denominated as "Matters Specially Pleaded."

### 1. *Paragraphs 65 and 69*

In paragraph 65, the Plaintiff alleges that the ceiling or cap on the amount of damages in medical malpractice claims provided by Code § 8.01-581.15 (hereinafter the "Medical Malpractice Cap")[6] does not apply to the conduct of the Defendants in this case because their conduct "go[es] beyond medical malpractice and arise[s] out of conduct of the defendants contrary to their medical obligations to their patient." ¶ 65. The Defendants respond that the Medical Malpractice Cap is applicable to the facts of this case and that the *ad damnum* clause in the Motion for Judgment should be reduced to $1,000,000.00.

The Court agrees with the Plaintiff that the Medical Malpractice Cap would not apply to Counts IV and V of the Motion for Judgment, to the extent they allege an action for fraud based on the purposeful misrepresentations by the Defendants of material facts related to Mrs. Dell's care. Such misrepresentations "could never arguably be classified as an inseparable part of examination or treatment," *Hagan*, 240 Va. at 351, and therefore, are not subject to the Medical Malpractice Cap. The other remaining counts of the Motion for Judgment appear to state variations of a claim for medical malpractice and are therefore subject to the Medical Malpractice Cap. For example, Counts VII and IX allege causes of action based on a theory of battery. The Virginia Supreme Court has held that such battery claims are in the realm of medical malpractice. *Glisson v. Loxley*, 235 Va. 62 (1988). Accordingly, the demurrer to paragraph 65 of the Motion is overruled in part and sustained in part.

In paragraph 69 of the Motion for Judgment, the Plaintiff alleges that the Defendants are estopped by the "nature of their conduct" in this case from pleading the applicability of the Medical Malpractice Cap. The Court

---

[6] Code § 8.01-581.15 provides, in pertinent part, that "[i]n any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after October 1, 1983 . . . the total amount recoverable for any injury to, or death of, a patient shall not exceed one million dollars."

cannot ascertain the difference between the allegations of paragraph 69 and those of paragraph 65. The Court's ruling on the demurrer to paragraph 69 is the same as it is in regard to paragraph 65. Therefore, the demurrer to paragraph 69 of the Motion is overruled in part and sustained in part.

The Court does not agree with the Defendants that, as to the counts of the Motion for Judgment sounding in medical malpractice, the *ad damnum* clauses should be reduced to $1,000,000.00 at the demurrer stage. "A trial court applies the remedies' limitation [i.e., the Medical Malpractice Cap] only *after* the jury has fulfilled its fact-finding function." *Etheridge v. Medical Center*, 237 Va. 87, 96 (1989) (emphasis in original). Hence, the appropriate procedure is to submit the case to the jury without informing the jury of the limit on recovery. Should the jury return a verdict in excess of the Medical Malpractice Cap, the trial judge will reduce the award to the amount of the Medical Malpractice Cap. Of course, should Counts IV and V survive a motion to strike at trial, special verdict forms will have to be employed because the Plaintiff's recovery, if any, under those counts is not subject to the Medical Malpractice Cap.

### 2. Paragraph 68

In paragraph 68 of the Motion for Judgment, the Plaintiff alleges that separate medical malpractice caps apply to the negligence of Dr. French on December 22, 1991, and to the separate and subsequent acts of the Defendants thereafter. The language of Code § 8.01-581.15 expressly applies to one or more "act or acts of malpractice." Furthermore, it is well-settled in Virginia that the Medical Malpractice Cap is a single limit that applies to an indivisible injury to a plaintiff although it was caused by the concurring negligence of two or more health care providers and regardless of how many theories of recovery are advanced. *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670 (1990); *Etheridge, supra*. Therefore, the demurrer to paragraph 68 of the Motion for Judgment is sustained.

### 3. Paragraphs 66 and 67: Constitutionality of the Cap under the Americans with Disabilities Act

In paragraph 66 of the Motion for Judgment, the Plaintiff alleges that the Medical Malpractice Cap is unconstitutional as applied to the facts of this case. Similarly, in paragraph 67 of the Motion for Judgment, the Plaintiff alleges that the Medical Malpractice Cap is unconstitutional on its face as it is violative of the separation of powers between the legislature

and the judiciary under the Constitution of Virginia. The Medical Malpractice Cap has been held to be constitutional under both the United States Constitution and the Constitution of Virginia. *Bulala v. Boyd*, 877 F.2d 1191 (4th Cir. 1989); *Etheridge v. Medical Center*, 237 Va. 87, 376 S.E.2d 525 (1989). The Medical Malpractice Cap has withstood challenge on the basis that it violates the separation of powers between the legislative and judicial branches of government. *Bulala, supra*.

The Plaintiff argues that the constitutionality *vel non* of the Medical Malpractice Cap must be scrutinized anew in light of the enactment of the federal Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (the "ADA"), and particularly the 1992 amendments to the ADA that prohibit discrimination against the disabled. According to the Plaintiff:

> The [Medical Malpractice Cap] discriminates against the disabled, for it is only those with disabling injuries whose recoveries would clearly otherwise exceed one million dollars that are impacted at all by the statute . . . . With the passage of the ADA, disabled Americans became a protected class, a "suspect" class
> . . . .

Plaintiff's Supplemental Memorandum, at pp. 2-3. Plaintiff argues that at least two federal district courts have held that, following the passage of the ADA, the disabled are a "suspect class." *Musko v. McClandless*, 1995 U.S. Dist. LEXIS 5911 (E.D. Pa. 1995); *Trautz v. Weismann*, 819 F. Supp. 282 (S.D. N.Y. 1993).

Under traditional constitutional analysis, if a law impacts disparately on the members of a "suspect class" or affects a "fundamental right," it is subject to "strict scrutiny" and will be held unconstitutional absent a compelling or overriding governmental justification. If, on the other hand, the law does not impact disparately on a suspect class or affect a fundamental right, it must have merely a "rational basis" for disparate treatment, that is, it must have a reasonable relation to a proper governmental purpose. *See Etheridge, supra*, at p. 97. In some cases, such as a classification based on gender or legitimacy, an intermediate standard of review is applied: a law will be upheld if it is substantially related to an important governmental purpose. *See Etheridge*, 237 Va. at 103, n. 7.

In *Etheridge*, the Virginia Supreme Court held that there was "no fundamental right . . . to a full recovery in tort." 237 Va. at 97. The Court upheld the constitutionality of the Medical Malpractice Cap under a "ra-

tional basis" test, which the parties in that case stipulated was the appropriate test for the purposes of judicial review. 237 Va. at 100, 103-104.

The Plaintiff in this case argues that *Etheridge* is no longer dispositive of the demurrer because the intervening passage of the ADA mandates that the Medical Malpractice Cap be evaluated under the "strict scrutiny" test in that the disabled are now a "suspect class."

The Defendants dispute that the passage of the ADA has created a "suspect class" of the disabled for the purposes of equal protection analysis. The Defendants cite *Contractors Ass'n of E. Penn. v. City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993); *More v. Farrier*, 984 F.2d 269 (8th Cir. 1993); and *Doe v. City of Chicago*, 883 F. Supp. 1126 (N.D. Ill. 1994), each of which holds that the ADA does not mandate that the disabled be deemed a suspect class for equal protection purposes.

Neither of the cases cited by the Plaintiff stand for the proposition that the ADA has created a suspect class of the disabled for the purposes of equal protection analysis. In both *Musko v. McClandless*, 1995 U.S. Dist. LEXIS 5911 (E.D. Pa. 1995), and *Trautz v. Weismann*, 819 F. Supp. 282 (S.D. N.Y. 1993), the court held that the disabled are a "protected class" for the purposes of actions based on 42 U.S.C. § 1985(3). Whether one is a member of a protected class for the purpose of a § 1985(3) action, which requires proof that a conspiracy is motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," *Griffin v. Breckinridge*, 403 U.S. 88, 102 (1971), is a separate question from whether one is a member of a "suspect class" for equal protection analysis. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272, 113 S. Ct. 753, 761, n. 4 (1993). The case of *Trautz v. Weismann*, relied upon by the Plaintiff, makes that point:

> While [the ADA] may not provide heightened scrutiny for discrimination against individuals with disabilities under the equal protection clause, it is relevant to Congress' interpretation of § 1985(3).

819 F. Supp. at 294.

In *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 1002, 105 S. Ct. 3249 (1985), the United States Supreme Court held that the mentally retarded are not a "suspect class" for the purposes of equal protection jurisprudence. In that case, the Court applied the "rational basis" test for determining the constitutionality of a zoning ordinance that allowed the denial of a special use permit for group homes for the mentally retarded.

The recent case of *Contractors Ass'n of E. Penn. v. City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993), holds that the adoption of the ADA did not overrule *Cleburne*, and that, even after the passage of the ADA, the "rational basis" test is the appropriate standard of review to determine the constitutionality of a city ordinance that gives preferences in awarding city contracts to handicapped persons. 6 F.3d at 1011-1012. Similarly, in *More v. Farrier*, 984 F.2d 269 (8th Cir. 1993), the Eighth Circuit held that the adoption of the ADA did not "alter the standard for constitutional equal protection claims." 984 F.2d at 271, n. 4. In that case, the court held that the wheelchair-bound are not a "suspect class" after the passage of the ADA and the "rational basis" test is the appropriate standard of judicial review of the plaintiffs' equal protection challenge to a prison regulation. 984 F.2d at 271. Finally, in *Doe v. City of Chicago*, 883 F. Supp. 1126 (N.D. Ill. 1994), the district court noted that the ADA is silent on whether the disabled are a suspect class for equal protection purposes. 883 F. Supp. at 1141, n. 9. Furthermore, in that case, the Court held that "[d]isabled persons are not a suspect class and, therefore, are not entitled to the 'strict scrutiny' equal protection analysis applied to classifications involving race or fundamental rights." 883 F. Supp. at 1140-1141.

The Court's research disclosed one case in which a court applied a test *other* than the "rational basis" test in evaluating a claim of discrimination against the disabled following the adoption of the ADA. In *Martin v. Voinovich*, 840 F. Supp. 1175 (S.D. Ohio 1993), the court opined that it would apply the "intermediate heightened scrutiny" test to determine the constitutionality of distinctions the State of Ohio makes among mentally handicapped persons in the provision of community housing and other state services. 840 F. Supp. at 1210. The Court in *Martin v. Voinovich* held that, under the intermediate scrutiny test, a classification must be "substantially related to a legitimate state interest." 840 F. Supp. at 1209.

In sum, all of the cases that have considered the issue since the adoption of the ADA have held that the ADA does not mandate that the disabled are a "suspect class" for equal protection purposes such that any classification which disproportionately impacts on the disabled is subject to the "strict scrutiny" test. One case has applied the "intermediate scrutiny" test. The remaining cases have applied the "rational basis" test for post-ADA equal protection challenges to a classification that disproportionately affects the disabled.

The Medical Malpractice Cap has already withstood challenges to its constitutionality under the "rational basis" test. *Bulala v. Boyd*, 877 F.2d

1191 (4th Cir. 1989); *Etheridge v. Medical Center*, 237 Va. 87, 376 S.E.2d 525 (1989). The Court is not persuaded that, if faced with the same issue in the post-ADA world, the Virginia Supreme Court would decide the constitutionality of the Medical Malpractice Cap any differently than it did in *Etheridge*. Even if the Virginia Supreme Court were to apply an "intermediate scrutiny" test, I conclude that it would hold that the Medical Malpractice Cap satisfies the "intermediate scrutiny" test. In *Etheridge*, the Supreme Court held that the Medical Malpractice Cap is "not arbitrary and bears a reasonable and *substantial* relation to the object sought to be accomplished by the legislation." 237 Va. at 103 (emphasis added). In holding that the Medical Malpractice Cap bears a "substantial" relation to the legislative goal, the Virginia Supreme Court in *Etheridge* was in effect applying the "intermediate scrutiny" test. As mentioned above, the Court in the one post-ADA case to apply a test other than the "rational basis" test, *Martin v. Voinovich, supra*, held that, under the intermediate scrutiny test, a classification must be "substantially related to a legitimate state interest." 840 F. Supp. at 1209.

In short, the adoption of the ADA by Congress in 1990 did nothing to alter the well-settled case law that the Medical Malpractice Cap of Code § 8.01-581.15 is constitutional. For that reason, the demurrer to Paragraphs 66 and 67 of the matters specially pleaded in the Motion for Judgment is sustained.